IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VERONICA WALKER, et al.          *

             Plaintiffs          *

        vs.                      *  CIVIL ACTION NO. MJG-16-3136

FRANK B. BISHOP, JR., et al.     *

             Defendants          *

*      *      *      *      *      *      *      *      *

**AMENDED** MEMORANDUM AND ORDER

The Court has before it Defendants' Motion to Dismiss Or,

In the Alternative, Motion for Summary Judgment [ECF No. 94],

Defendant Reginald Heavener's Motion to Dismiss Plaintiffs'

Amended Complaint [ECF No. 93], and the materials submitted

relating thereto.  The Court has held a hearing and has had the

benefit of arguments of counsel.

I.   <u>BACKGROUND</u> [1]

In the original Complaint [ECF No. 1], Plaintiffs asserted

claims against the State of Maryland and eleven Individual

Defendants.[2]  The Court granted Defendants' motions to dismiss

Plaintiffs' Complaint, and dismissed all claims asserted in that

Complaint.  <u>See</u> Memorandum and Order at 25, ECF No. 81

---

[1]    The "facts" stated herein are as alleged in the Amended Complaint
and are not necessarily agreed to by Defendants.

[2]    Including three John Doe defendants.

("Memorandum and Order").  Certain claims were dismissed with
prejudice, i.e., negligence, funeral expenses, and all claims
against the State of Maryland.  However, leave was granted for
Plaintiffs to file an Amended Complaint asserting other claims
against the Individual Defendants.  Thereafter, Plaintiffs filed
the Amended Complaint [ECF No. 86].[3]  By the instant motions,
Defendants seek dismissal of all claims against them, and in the
alternative, summary judgment pursuant to Rule 56.[4]

The Court finds it premature to proceed on a motion for
summary judgment prior to any discovery and will treat both
motions solely as motions to dismiss.  In doing so, the Court
shall consider only non-conclusory factual allegations in the
Amended Complaint, and not any materials or exhibits presented
that are not included in the Amended Complaint.

This case pertains to the September 13, 2013 killing of
inmate Jason Wallace ("Wallace") by his cellmate, Darnell
Thompson ("Thompson"), in their cell at Western Correctional
Institution ("WCI").  Plaintiffs, Wallace's parents (Veronica

---

[3]     Plaintiffs filed an Amended Complaint on October 16, 2017 [ECF
No. 83] in order to meet a Court-ordered deadline, but then requested
and were granted an additional week to file a finalized version.  The
Court addresses herein the Amended Complaint filed on October 23, 2017
at ECF No. 86.

[4]     Defendant Heavener's separate Motion [ECF No. 93] does not
request summary judgment.

Walker[5] and Gilbert Wallace), and his surviving minor children,
V.W. and K.W., (collectively, "Plaintiffs"), file the Amended
Complaint [ECF No. 86] asserting claims against the nine
Individual Defendants:  the former Warden Frank B. Bishop, Jr.
("Bishop"), Captain George Sneathen ("Sneathen"), Correctional
Officer William May ("May"), Correctional Officer Reginald
Heavener ("Heavener"), Correctional Officer David Stevey
("Stevey"), Correctional Officer Drew Cook ("Cook"), and three
"John Doe" Correctional Officers (collectively, "Defendants").[6]

Plaintiffs assert the following claims:

| Count # | Asserted Claim | Defendants |
|---------|----------------|------------|
| I | Violation of 42 U.S.C. § 1983 (Eighth and Fourteenth Amendments) | Heavener, Cook, May, Stevey |
| II | Violation of 42 U.S.C. § 1983 (Eighth and Fourteenth Amendments) | Bishop, Sneathen, and the three John Doe Defendants |
| III | Violation of Maryland Declaration of Rights Articles 24 and 25 | All Defendants |
| IV | Wrongful Death | All Defendants |
| V | Survival Action | All Defendants |
| VI | Gross Negligence | All Defendants |

---

[5]    Individually and as Personal Representative of the Estate of
Jason Wallace.

[6]    The John Doe Officers are described as the Chief Psychologist,
the Chief of Security, and the Housing Unit Manager.  The State of
Maryland, Gary Maynard, and Roderick Sowers are no longer parties to
the case.

Essentially, Plaintiffs assert claims based upon the assignment of Thompson to be Wallace's cellmate, and the events of September 13, 2013 resulting in the death of Wallace.

A. Assignment of Thompson and Wallace as Cellmates

On the date of his death, September 13, 2013, Wallace was incarcerated at WCI in the general population[7] and assigned to Housing Unit #3. Am. Compl. ¶ 22. Housing Unit #3 houses inmates who have been released from disciplinary segregation, who are ineligible or removed from "high privileged tiers," overflow inmates, certain disabled inmates, or inmates deemed "detrimental to the good order and operation" of WCI. Id. ¶ 26.

Housing assignments at WCI are made based upon security, program needs, and "behaviorally oriented factors." Id. ¶ 27. For this purpose, WCI maintains a "case management system" which stores information about inmates, including who has been identified as a sexual predator, as a danger to others, and/or as having certain vulnerabilities. Id. ¶ 28. Inmates who are mentally ill or have special needs may be placed in special needs housing or another institution (e.g., CMHC-J at Patuxent), based on decisions made by the Chief Psychologist, the Warden,

_____

[7]    Pursuant to state directives, WCI had five housing designations: general population, protective custody, administrative segregation, disciplinary segregation, and special needs housing.  Am. Compl. ¶ 23.

and the Chief of Security. Id. ¶¶ 29-30. "Routine" inmate housing assignments are made by the Housing Unit Manager or the Correctional Officer in charge of the Housing Unit, after taking into account "age, physical characteristics, intelligence information, . . . behavior record," and whether the inmate cellmates will get along. Id. ¶ 31.

Thompson was serving a life sentence for murder and had been transferred from disciplinary segregation in North Branch Correctional based on some undescribed "altercation" with another inmate. Id. ¶¶ 32-33. Prior to joining the general population at WCI, Thompson was housed in administrative segregation. Id. ¶ 33. After joining the general population, Thompson committed multiple housing violations, landing him in disciplinary segregation. Id. ¶ 35. Thompson allegedly had a "history throughout his incarceration of repeatedly attacking other inmates and law enforcement officers," and had received criminal sentences for some of those attacks. Id. ¶ 36. For example, in 2002, Thompson was convicted of Reckless Endangerment. Id. In 2011, Thompson was convicted of Second Degree Assault on a Law Enforcement officer. Id.

Plaintiffs allege that it was "well known" that Thompson suffered from "a mental and/or psychological illness" which involved eating foreign objects, putting strange materials in his hair, talking to himself, talking about hurting others, and

wandering around the prison pretending to shoot others.  Id. ¶
37.  These behaviors were "observed by anyone who came into
contact with" him.  Id. ¶ 38.

At some point, an Assistant State's Attorney for Alleghany
County had filed a "Suggestion of Incompetency" confirming that
Thompson had been diagnosed with "Nonorganic Psychosis,"[8] and
"believed Thompson to be delusional."  Id. ¶¶ 39-40.  A year
prior to Wallace's murder, Thompson's case management file
stated that Thompson "displayed behavior that could possibly be
a threat to the institution."  Id. ¶ 41.

On September 2, 2013, Wallace was assigned to share a cell
with Thompson.  This decision was approved by Defendant Warden
Bishop and two John Doe Defendants, the Chief of Security and
the Chief Psychologist.  Id. ¶ 42.  Wallace was "Muslim and was
5'7 and weighed approximately 182 pounds."  Id. ¶ 54.  Thompson
was "not Muslim and was" larger, described as "6'4 and [who]
struck a very imposing figure."  Id.  The assignment was
allegedly "not in compliance with WCI's directives set forth for
internal movements and assignments of inmates."  Id.

---

[8]     The Amended Complaint does not state when the Suggestion of
Incompetency was filed, to whom it was filed, and whether it was in
Thompson's case management file.  It also states that the contents
were "known and verified by prison mental health staff" but it is
unclear who the staff members were and whether they were WCI staff or
from another institution.  A reasonable inference from the record is
that this was filed with the state court during Thompson's criminal
trial for Wallace's death.  See id. ¶ 40.

Plaintiffs allege that the Individual Defendants knew about Thompson's prior violence and mental health issues but, contrary to WCI's rules and regulations, approved the cell assignment with Wallace and failed to take measures to report or mitigate the harm that Thompson posed to Wallace. Id. ¶¶ 42-43. The Amended Complaint states that "[U]pon information and belief," this reassignment was done intentionally by Defendants "as retribution for an earlier altercation involving Wallace and a staff member within the Housing Unit at WCI." Id. ¶ 45. There are no allegations stating who was involved in this "altercation," when it occurred, and under what circumstances.

On September 3, 2013, Wallace wrote to his family, expressing concerns for his safety and stating that he wanted to be transferred out of the cell he shared with Thompson to another cell as soon as possible. Id. ¶ 44. Wallace, however, did not take action to seek a transfer at WCI and was murdered 10 days later. Id.

B. Wallace's Murder on September 13, 2013

On the date of the murder, Captain Sneathen was the "highest-ranking official in charge" for Housing Unit #3, Officer Cook was the "Officer in Charge" of Housing Unit #3, and Officers Heavener, Stevey, and May were correctional officers assigned to Housing Unit #3. Id. ¶¶ 49-53.

That evening, Wallace was assaulted and beaten by Thompson in their cell sometime between 6:10 PM and 6:30 PM.  Id. ¶ 55. After the beating he lay injured on the floor of his cell until, more than two hours later, he was discovered by officers and later died from his injuries.  Id. ¶¶ 67-69.

Before the assault, at 6:10 PM, Wallace and Thompson had returned to their cell after dinner.  Id. ¶ 56.  Officer Heavener "conducted a head count on the tier" starting at 6:10 PM and finishing at 6:30 PM, and then returned to the control room.  Id. ¶¶ 57-58.  Thus, Heavener was allegedly on the tier at the time of the assault.

Around 6:30 PM, the Special Housing Observation Unit ("SHOU") contacted the control room and requested that Thompson report to them for urinalysis testing.  Id. ¶ 58.  When this request was made, Officers Heavener, May, Stevey, and Cook were in the control room.  Defendants "Heavener [and/]or May unlocked" Thompson's and Wallace's cell at approximately 6:30 PM.  Id. ¶ 58.  Thompson went "unescorted" from his cell to the control room and was then escorted to SHOU by Defendant Stevey for urinalysis testing.  Id. ¶ 59.

Plaintiffs allege that the Individual Defendants failed to notice that Wallace had been attacked.  Officer Heavener stated at Thompson's murder trial that he watched Thompson walk down the tier towards the control room wearing white shoes rather

than his usual brown boots, "which he thought was strange." Id. ¶ 60. When escorting Thompson to SHOU, Officer Stevey "failed to see" blood stains on Thompson's shirt sleeve, rips in his shirt, and his bloody knuckles. Id. ¶ 61. Another inmate, Middleton, was housed in a nearby cell and testified at Thompson's trial that between 6:10 and 6:30, he heard Wallace say "Chill dog" to Thompson. Id. ¶ 62. Middleton also heard "sounds of fighting" and the sound of "metal scraping along the floor" coming from the shared cell. Id.

Officer Heavener conducted "another walk on the tier" and noted at 7:00 PM that the tier was secure. Id. ¶ 66. At 7:30 PM, the inmates of the tier were sent to the Recreational Hall. Id. ¶ 66. At this time, both Officer Heavener and Officer May "noticed several inmates making a point to walk past" Thompson's and Wallace's cell, "survey the inside and then talk amongst themselves." Id. ¶ 66. Nothing was done in response to this observation.

Wallace was not discovered until "well over an hour later," (presumably, 8:30 PM or later), when Middleton approached Officers Heavener and May and told them that Wallace was lying unresponsive on the floor of his cell. Id. ¶ 67. When the two officers arrived at the cell, Wallace's "head and chest" were "under his bunk" and he was bleeding from his ears, nose, and mouth, although he was still alive and "making a wheezing or

gargling noise." Id. ¶ 68. He had sustained massive head trauma with exposed brain matter and later died from his injuries. Id. ¶ 69. Ultimately, Thompson was convicted of second degree murder for Wallace's death.

## II. DISMISSAL STANDARD

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(citations omitted). When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff. However, conclusory statements or a "formulaic recitation of the elements of a cause of action" will not suffice. Id. A complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009)(quoting Twombly, 550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense." Id. Thus,
if the well-pleaded facts contained within a complaint "do not
permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged – but it has not shown –
that the pleader is entitled to relief." Id. (quoting Ashcroft
v. Iqbal, 556 U.S. 662, 679 (2009)).

Generally, a motion to dismiss filed under Rule 12(b)(6)
cannot reach the merits of an affirmative defense. Goodman v.
Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007). However,
affirmative defenses are appropriate to consider at the Rule
12(b)(6) stage "when the face of the complaint clearly reveals
the existence of a meritorious affirmative defense." Occupy
Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013) (emphasis
added) (quoting Brockington v. Boykins, 637 F.3d 503, 506 (4th
Cir. 2011)).


III. DISCUSSION

A. Counts I and II — Federal Constitutional Claims

Plaintiffs assert claims under 42 U.S.C. § 1983 for alleged
violations of rights provided by the Eighth and Fourteenth
Amendments. Count I is asserted against Defendants Heavener,
Cook, May, and Stevey ("Inferior Officers"). Count II is
asserted against Defendants Bishop, Sneathen, and the three John
Doe Defendants ("Superior Officers"), and includes an allegation

11

that these Defendants failed to supervise their inferiors.  The
Court will address these two counts together.

Section 1983 provides:

> Every person who, under color of [state law]
> subjects, or causes to be subjected, any
> citizen of the United States . . . to the
> deprivation of any rights, privileges, or
> immunities secured by the Constitution and
> laws, shall be liable to the party injured
> . . . .

42 U.S.C. § 1983.  Thus, to establish a § 1983 claim, a
plaintiff must prove that a defendant:

1.  Acted under color of state law,
2.  Deprived him/her of a right secured by the
Constitution, and
3.  Is not entitled to qualified immunity.

There is no doubt that all pertinent actions of the
Individual Defendants were performed under color of state law,
i.e., as state officials.


1.  Eighth Amendment Claims

The Eighth Amendment to the United States Constitution
provides that "[e]xcessive bail shall not be required, nor
excessive fines imposed, nor cruel and unusual punishments
inflicted."  U.S. Const. amend. VIII.  "The Eighth Amendment
imposes a duty on prison officials 'to protect prisoners from
violence at the hands of other prisoners.'"  Odom v. S.C. Dep't
of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (quoting Farmer v.

Brennan, 511 U.S. 825, 833 (1994)).  To establish a failure to
protect claim under the Eighth Amendment's prohibition of cruel
and unusual punishment, a plaintiff must prove that (1) there
was a "sufficiently serious" deprivation, and (2) the defendants
had a "sufficiently culpable state of mind."  Farmer, 511 U.S.
at 834.

For the first part of the test, "the inmate must show that
he is incarcerated under conditions posing a substantial risk of
serious harm."  Id.  "[T]o demonstrate such an extreme
deprivation, a prisoner must allege a serious or significant
physical or emotional injury resulting from the challenged
conditions . . . ."  Odom, 349 F.3d at 770 (alteration in
original) (quoting De'Lonta v. Angelone, 330 F.3d 630, 634 (4th
Cir. 2003)).

For the second part of the test, the requisite state of
mind "is one of 'deliberate indifference' to inmate health or
safety."  Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501
U.S. 294, 302-303 (1991)).  Deliberate indifference "entails
something more than mere negligence" but it can be "satisfied by
something less than acts or omissions for the very purpose of
causing harm or with knowledge that harm will result."  Id. at
835.  "It is . . . fair to say that acting or failing to act
with deliberate indifference to a substantial risk of serious
harm to a prisoner is the equivalent of recklessly disregarding

that risk." <u>Id.</u> at 836.

Courts apply a subjective standard, under which "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837.

The Court has held in the Memorandum and Order [ECF No. 81] that Plaintiffs adequately alleged the first element of serious harm. <u>See</u> <u>Parker v. Maryland</u>, 413 F. App'x 634, 638 (4th Cir. 2011) ("Since Parker was murdered while in custody, the first part of the test is clearly satisfied.").

The question now presented is whether the Amended Complaint plausibly alleges a claim that any specific Individual Defendant was aware of facts upon which he could draw an inference that a substantial risk of serious harm existed either before or during Thompson's attack, <u>and</u> that the particular Defendant actually drew such an inference.[9]

---

[9]     Plaintiffs also make reference to "excessive and unreasonable force and seizure" claims, <u>see, e.g.</u>, Am. Compl. ¶ 82, but there are simply no facts alleged to support a claim that the officials used force or physically confronted Wallace at any point. <u>See, e.g.</u>, <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992).

a. <u>Count I: Liability Of Inferior Officers</u>

Count I is asserted against Defendants Heavener, Cook, May, and Stevey (collectively, the "Inferior Officers"), alleging that:

- Defendants Heavener, Cook, May, and Stevey failed to protect Wallace from physical harm despite knowing of Thompson's history of violence, Am. Compl. ¶ 76;

- Defendants Heavener, May, Stevey knew or should have known that Thompson was a threat to Wallace's safety yet "allowed for this cell assignment to continue," <u>id.</u> ¶¶ 77, 83, 88;

- Defendant Heavener deliberately failed to stop the attack by ignoring sounds and signs of the struggle, <u>id.</u> ¶ 78;

- Defendants Heavener, May, Stevey should have known that Wallace was in need of medical attention yet failed to act, <u>id.</u> ¶¶ 79, 84, 89;

- Defendant Cook "showed deliberate indifference" to the safety of Wallace by allowing him to be assigned to a cell with Thompson, <u>id.</u> ¶ 93; and

- Defendants Heavener, May, Stevey, and Cook "deliberately ignored the attack" on Wallace by Thompson, <u>id.</u> ¶ 97.

The allegations in Count assert the failure of Defendants Heavener, Cook, May, and Stevey to (1) challenge the cell assignment, (2) stop the attack, and (3) respond in time to provide Wallace with needed medical attention.

The Court noted in the Memorandum and Order that the original Complaint did not allege sufficient facts to establish a plausible claim against any specific Individual Defendant.

Memorandum and Order at 16, ECF No. 81. To state a claim against an individual under § 1983, a plaintiff must show "that the official charged acted personally in the deprivation of the plaintiffs' rights." Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977).

First, the Amended Complaint presents conclusory allegations that the Inferior Officers (Heavener, May, Stevey, Cook) failed to challenge the housing assignment. For example, it states that Defendants Heavener, May, Stevey, and Cook were responsible for the "inspection, monitoring, safekeeping and security" of Wallace's Housing Unit. Am Compl. ¶ 38. They were responsible for monitoring the Housing Unit and tier on which Wallace and Thompson were housed. Id. ¶¶ 50-53. The four Defendants are faulted for failing to take steps to separate Thompson and Wallace and allowing them to share a cell together. Id. ¶ 43. These allegations do no more than state the officers' daily responsibilities and allege generally that they acted with deliberate indifference in not challenging the housing assignment.

Next, the allegations regarding the murder of Wallace on September 13, 2013 must be evaluated separately for each individual Inferior Officer.

That night, Defendant Heavener conducted a head count on the tier starting at 6:10 PM and ending at 6:30 PM, and then

16

returned to the control room.  Id. ¶¶ 57-58.  Therefore, he was
on the tier during the time the attack was ongoing and in a
position to possibly hear or see indications that Wallace was
being attacked.  Defendants Heavener and/or or May unlocked
Thompson and Wallace's cell so that Thompson could go to
urinalysis testing.  Id. ¶ 59.  Heavener testified at the
Thompson murder trial that he noticed Thompson was wearing white
shoes rather than his usual brown boots, "which he thought was
strange."  Id. ¶ 60.  He conducted a second walk on the tier at
7:00 PM but did not come to the aid of Wallace who was then
lying on the floor in his cell, severely injured and bleeding.
Id. ¶¶ 64-65.  He "noticed several inmates making a point to
walk past Wallace's cell" and testified at the murder trial that
this behavior was out of the ordinary, yet he did not come to
the cell to investigate.  Id. ¶ 66.  An hour or more after his
walk on the tier, Heavener was approached by another inmate,
Middleton, and was told that Wallace was unresponsive.  He then
and found Wallace lying on the floor of his bunk.  Id. ¶ 67.
Recognizing the existence of genuine issues of material fact,
the Court finds the allegations sufficient to present a
plausible claim that Heavener knew of and deliberately
disregarded Wallace's needs.

The allegations are not, however, sufficient to present a
plausible claim against any other Individual Defendant.

Defendant May was alleged to be in or near the control room during the attack but is not alleged to have heard sounds of the attack. Nor is he alleged to have been informed of whatever Heavener may have observed during his walks on the tier during and after the attack. The Amended Complaint alleges that May and/or Heavener unlocked the cell housing. This "conditional" statement does not amount to an allegation that May was present at the cell and in a position to see Wallace lying on the floor. Id. ¶¶ 59, 131. Like Heavener, May "noticed several inmates making a point to walk past Wallace's cell" and testified at the murder trial that this behavior was out of the ordinary, yet he did not come to cell to investigate. Id. ¶ 66. And like Heavener, after 8:30 P.M., May was approached by Middleton, was told that Wallace was unresponsive, and found Wallace lying on the floor of his bunk. Id. ¶ 67.

The allegations against May lack the critical allegations against Heavener of presence on the tier at the time of the attack and presence on the tier at 7:00 P.M. for a second walk that led to the conclusion that all was secure. Because those critical allegations are not made against May – which would have indicated a plausible possibility that he had been in a position to view the inside of the cell but disregarded seeing Wallace lying on the floor injured – the Court finds that Plaintiffs have insufficiently pleaded a claim against May.

18

The allegations against Defendants Stevey and Cook are even less substantial than those against May. Defendant Stevey escorted Thompson from the control room to the SHOU for urinalysis testing. Id. ¶ 59. He is faulted for not noticing "blood stains on Thompson's shirt sleeve," "Thompson's ripped shirt," or "Thompson's bloody knuckles."[10] Id. ¶ 61. Defendant Cook was the officer in charge of the Housing Unit that day, and was allegedly in the control room during the time the attack occurred. Id. ¶¶ 50, 59, 93.

The allegations against May, Stevey, and Cook do not present a plausible claim that any of these individual Inferior Officers was aware of a substantial risk of harm to Wallace before or during the attack. These officers are not alleged to have knowledge of Thompson's mental health diagnoses or that any such diagnoses would have posed a substantial risk of harm to Wallace or others at WCI. Nor do the various signs of something amiss (e.g., inmates standing in front of the cell, Thompson wearing different boots, or Thompson's allegedly swollen or bloody knuckles) support a finding that these officers actually drew such an inference of substantial harm. Farmer, 511 U.S. at

---

[10]    Other parts of the Amended Complaint state that Stevey should have noticed blood on Thompson's shoe and swollen knuckles (not bloody knuckles). Am. Compl. ¶¶ 89, 136. This statement may contradict another allegation suggesting that Thompson had changed shoes after the attack. Id. ¶ 60.

837 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").  Nothing indicates that the three officers were aware of the attack and deliberately ignored it.  Furthermore, nothing indicates that the officers did not immediately seek medical support when they were alerted to Wallace's injuries.

Defendant Heavener stands in a different position from the other Individual Defendants.  Heavener conducted two head counts of the tier: one from 6:10 PM to 6:30 PM, during the period the attack was allegedly occurring, and a second at 7:00 PM, when Wallace was allegedly already lying on the bottom of his bunk.  It is reasonable to infer that conducting a head count includes physically walking past the cells in the tiers and looking into the cells so that it is plausible that he would have seen Wallace's condition.  During the 6:10 PM to 6:30 PM time frame, when Heavener was on the tier conducting a head count, at least one other inmate on the tier could hear the sounds of a struggle and of metal scraping against the floor.  Of course, Heavener may deny that he heard or saw any signs of an attack or struggle because he was too far from Thompson's and Wallace's cell.  However, a Motion to Dismiss is not the proper vehicle to obtain a factual finding regarding Plaintiff's disputed allegations.  Taking Plaintiff's factual allegations as true, the Court finds

that it is at least plausible that Heavener noticed signs of the attack on Wallace and made a deliberate decision to ignore them. That is all that is required at the pleading stage.

Accordingly, Count I shall be dismissed against individual Inferior Officers May, Stevey, and Cook, but remains pending against individual Inferior Officer Heavener.

b. <u>Count II: Liability Against Superior Officers</u>

Count II, asserted against Defendants Bishop, Sneathen, and the three John Doe Defendants, alleges that:

- Defendants Bishop, Sneathen, and the John Doe Defendants failed to protect Wallace from physical harm despite "specific knowledge of Thompson's history of violence," <u>id.</u> ¶ 104;

- Defendant Bishop and the John Doe Defendants failed to comply with WCI's housing directives by allowing Thompson to be in the general population, <u>id.</u> ¶ 105;

- Defendants Bishop, Sneathen, and the John Doe Defendants did not follow policy when assigning Wallace to the same cell as Thompson and not assigning Thompson to special confinement housing, <u>id.</u> ¶ 106;

- Defendant Bishop and two John Doe Defendants (the Chief Psychologist and the Chief of Security) allowed Thompson to be housed in general population instead of in a facility equipped to handle mentally ill inmates, <u>id.</u> ¶ 107;

- Defendant Sneathen was the highest ranking officer assigned to Housing Unit #3 and allowed Thompson to remain on the tier with Wallace, <u>id.</u> ¶ 110;

- Defendant Sneathen failed to supervise Defendants Heavener, May, Cook, and Stevey to ensure they were

properly monitoring Housing Unit #3 and the safety of
Wallace, id. ¶ 111;

- A John Doe Defendant (the Housing Unit Manager) did
not follow WCI directives when assigning Wallace to
share a cell with Thompson, id. ¶ 115;

In sum, the allegations in Count II pertain to the Superior

Officers' allegedly (1) improperly assigning Thompson and

Wallace to the same cell and (2) failing to supervise the

Inferior Officers (who should have either challenged the housing

assignment or have properly monitored Housing Unit #3 on the day

of the murder).

Respondeat superior liability for a constitutional tort

does not apply in § 1983 cases.  See Monell v. Department of

Social Services, 436 U.S. 658, 691 (1978); Love-Lane v. Martin,

355 F.3d 766, 782 (4th Cir. 2004); see also Eastman v. Warden,

Baltimore City Det. Ctr., No. CCB-10-2389, 2011 WL 210343, at *2

(D. Md. Jan. 21, 2011) (finding an inmate's claim against the

Warden defective when the inmate "raises no allegations in the

complaint against the Warden").

Therefore, Plaintiffs characterize their claim as one for

"failure to supervise," a claim which must meet a high bar:

> Generally, a failure to supervise gives rise
> to § 1983 liability, however, only in those
> situations in which there is a history of
> widespread abuse.  Only then may knowledge
> be imputed to the supervisory personnel . .
> . . A single act or isolated incidents are
> normally insufficient to establish
> supervisory inaction upon which to predicate

§ 1983 liability.

Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir. 1983).

A failure to supervise claim requires proof of three

elements:

> (1) that the supervisor had actual or
> constructive knowledge that his
> subordinate was engaged in conduct that
> posed "a pervasive and unreasonable
> risk" of constitutional injury to
> citizens like the plaintiff;
>
> (2) that the supervisor's response to that
> knowledge was so inadequate as to show
> "deliberate indifference to or tacit
> authorization of the alleged offensive
> practices,"; and
>
> (3) that there was an "'affirmative causal
> link' between the supervisor's inaction
> and the particular constitutional
> injury suffered by the plaintiff."

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

The facts alleged do not plausibly suggest a history of

widespread abuse.  The allegations made in the Amended Complaint

are limited in scope to the September 13, 2013 single incident

of Thompson's assault of Wallace.  There is no suggestion of

other similar abuses or conduct that posed a "'a pervasive and

unreasonable risk' of constitutional injury."  Id.  Plaintiff's

presentation of news articles stating that showing that other

unrelated Maryland inmates were murdered by their cellmates does

not establish the plausible existence of a custom or practice at

WCI or provide a basis to impute these events to the Defendants in the instant case.

Moreover, the Amended Complaint does not allege facts sufficient to find the individual Superior Officers liable for their personal involvement in Wallace's assault and death.

Defendant Bishop had general oversight duties as Warden of WCI (Am. Compl. ¶ 12), was responsible for implementing certain WCI directives but allegedly did not do so (id. ¶¶ 24, 46), approved Thompson's transfer into general population (id. ¶¶ 42, 71), declined to place Thompson in administrative or disciplinary segregation (id. ¶ 46), and declined to take other actions to separate Thompson and Wallace (id. ¶ 48).

Defendant Sneathen was Captain at WCI and the highest-ranking official in charge of Wallace's housing unit (id. ¶¶ 13, 49), was responsible for the "supervision, inspection, monitoring, safekeeping and security" of Wallace's housing unit (id. ¶ 38), allowed Thompson and Wallace to remain housed together (id. ¶ 43), was responsible for implementing WCI directives and supervising the inferior correctional officers (id. ¶ 49), and did not take action to stop the attack or render medical assistance to Wallace (id. ¶ 63).

The allegations for the John Doe Defendants are similar to

the allegations for Bishop and Sneathen.[11]  Id. ¶¶ 18-20, 46-48,
71, 105, 106, 146-147.

These allegations are generalized, conclusory, and contain
few specifics beyond statements of the duties and
responsibilities of these officers.  The statement of these
officers' daily responsibilities, without more, does not give
rise to a plausible claim of violation of Eighth Amendment
rights by the Individual Defendants.

Accordingly, Plaintiffs' Eighth Amendment claims in Counts
I and II shall be dismissed against the Superior Officers
Bishop, Sneathen, and the three John Doe Defendants.


### 2. Fourteenth Amendment Claims

The Fourteenth Amendment to the United States Constitution
provides that "[n]o State shall . . . deprive any person of
life, liberty, or property, without due process of law."  U.S.
Const. amend. XIV, § 1.  The Memorandum and Order stated that
Plaintiffs were relying on a substantive due process claim, not
a procedural due process claim.  Memorandum and Order at 18, ECF
No. 81.  Likewise, the Amended Complaint states that Wallace was
deprived of his "right to be free from the deprivation of life

---

[11]   Indeed, the Plaintiffs' allegations for these three John Doe
Defendants are not materially distinguished from each other.

and liberty without due process of law." See, e.g., Am. Compl.
¶ 82.

An inmate's Fourteenth Amendment substantive due process
claim is essentially equivalent to an Eighth Amendment claim.[12]
To establish a substantive due process claim, a plaintiff must
prove that a defendant abused executive power in a way that
"shocks the conscience" because of its egregiousness. Cty. of
Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998). The
deliberate indifference standard used in Eighth Amendment cases
may also "satisfy the fault requirement for due process
claims." Id. at 850. Allegations of negligent lack of due care
by prison officials do not trigger procedural or substantive due
process protections.[13] Davidson v. Cannon, 474 U.S. 344, 347-48
(1986).

For reasons stated above, the Court finds that the
Plaintiffs also have not stated plausible Fourteenth Amendment
Claims against any of the Individual Defendants except for
Heavener. Accordingly, Plaintiffs' Fourteenth Amendment Claims

---

[12]    C.f. Hill v. Nicodemus, 979 F.2d 987, 990-91 (4th Cir. 1992);
Brown v. Harris, 240 F.3d 383, 388 (4th Cir. 2001); King-Fields v.
Leggett, No. CIV.A. ELH-11-1491, 2014 WL 694969, at *10 (D. Md. Feb.
19, 2014)(Hollander, J.)(applying Eighth Amendment standards used to
assess claims brought by convicted prisoners to Fourteenth Amendment
claims asserted by pretrial detainees).

[13]    Thus, any claims based upon negligent failure to follow policies
or to provide adequate resources or staff are constitutionally
insufficient.

shall be dismissed against all Individual Defendants except for Heavener.

### 3. Qualified Immunity

The Court will dismiss the federal claims for failure to state a plausible claim against all Individual Defendants except for Defendant Heavener.  Accordingly, the Court need only address qualified immunity for Defendant Heavener.

"Qualified immunity, when found to apply, bars § 1983 suits against government officers in their individual capacity." Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 330 (4th Cir. 2009).  The qualified immunity inquiry by the court involves two steps:  First, to determine "whether a constitutional right would have been violated on the facts alleged," and second, to decide "whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right."  Id.

The Court recognizes that the question of qualified immunity is ultimately a legal one, id. at 331, but in the instant case the Court finds it now premature to resolve this issue.  Discovery appears likely to present evidence relevant to the rights (if any) actually violated and whether a reasonable official in Defendant Heavener's position would have violated a

clearly established right.  Raub v. Campbell, 785 F.3d 876, 882

(4th Cir. 2015) ("we look not to whether the right allegedly

violated was established 'as a broad general proposition' but

whether 'it would be clear to a reasonable official that his

conduct was unlawful in the situation he confronted.'").

Accordingly, the Court is not now resolving whether Heavener

would be entitled to dismissal of Plaintiffs' claims by virtue

of qualified immunity.


   B. Counts III-VI: Maryland Constitutional Claims, Wrongful
      Death, Survival Action, and Gross Negligence

      1.  Statutory Immunity

   The Memorandum and Order dismissed the Plaintiff's common

law claims based on negligent conduct because the Individual

Defendants are statutorily immune from these suits.  Memorandum

and Order at 23, ECF No. 81; Md. Code Ann., State Gov't § 12-

105; Conaway v. State, 672 A.2d 162, 172 (Md. Ct. Spec. App.

1996); Young v. City Of Mt. Ranier, 238 F.3d 567, 578 (4th Cir.

2001); Lee v. Cline, 863 A.2d 297, 310 (Md. 2004).

   The Amended Complaint appears to rely on allegations of

malice and gross negligence by the Individual Defendants, which

claims are not immunized by statutory immunity.  See Am. Compl.

¶ 170 (Count V survival action states that "[t]he aforesaid acts

and omissions exceeded mere negligence and/or gross

negligence"); id. ¶ 179 et seq. (Count VI alleging gross
negligence).

"Malice" for statutory immunity purposes "requires a
showing that 'the official 'intentionally performed an act
without legal justification or excuse, but with an evil or
rancorous motive influenced by hate, the purpose being to
deliberately injure the plaintiff''" and "may be inferred from
the surrounding circumstances." Talley v. Farrell, 156 F. Supp.
2d 534, 545 (D. Md. 2001) (quoting Green v. Brooks, 725 A.2d
596, 610 (Md. Ct. Spec. App. 1999)). Plaintiffs "'must allege
with some clarity and precision those facts which make the act
malicious.'" Id.

Plaintiff's allegations do not present a plausible claim of
malice on the part of any Individual Defendant. There are no
allegations showing "an evil or rancorous motive influenced by
hate, the purpose being to deliberately injure the plaintiff.'"
Talley, 156 F. Supp. 2d at 545 (D. Md. 2001). There is an
unsupported allegation in the Amended Complaint that some
officers put Wallace in Thompson's cell as retribution for a
prior altercation that had occurred between Wallace and an
unnamed correctional officer on the tier, but there are no
detailed allegations about this altercation, who was involved,
between whom, under what circumstances it occurred, and how
close in time the altercation was to the housing assignment

decision.  Am. Compl. ¶¶ 45, 77.

Gross negligence, in the context of statutory immunity, has
been defined as:

> something more than simple negligence, and
> likely more akin to reckless conduct; gross
> negligence is "an intentional failure to
> perform a manifest duty in reckless
> disregard of the consequences as affecting
> the life or property of another, and also
> implies a thoughtless disregard of the
> consequences without the exertion of any
> effort to avoid them."

Cooper v. Rodriguez, 443 Md. 680, 707, 118 A.3d 829, 845 (2015)

(quoting Barbre, 935 A.2d at 717).

The Amended Complaint provides a list of the alleged
grossly negligent tortious conduct by all Defendants, including
the failure to:

> "a. Examine, diagnose, and treat Thompson's
> mental illness;
>
> b. Adhere to WCI's rules, regulations,
> policies, procedures, and penological
> practices concerning inmate safety by
> allowing a violent and known mentally ill
> inmate into general population;
>
> c. Assign Thompson to special confinement
> housing, administrative segregation, and/or
> a behavior management program;
>
> d. Ensure the safety of Wallace in
> accordance with WCI' policies and
> procedures,
>
> e. Render aid when Thompson attacked and
> killed Wallace; and
>
> f. All additional facts and circumstances,

> acts, errors, and omissions, which amounted
> to, an utter disregard of care and a
> complete neglect of safety owed to Wallace
> and proximately caused strangulation,
> assault, and battery and death of Wallace
> and damages set forth."

Am. Compl. ¶ 182.

These statements do not constitute factual allegations that plausibly allege gross negligence beyond stating generally the necessary elements for the tort. Plaintiffs seek to have the Court consider all Individual Defendants together as a single person by assuming that what one may know or learn is known to all the others. Plaintiffs also seek to have the Court assume that what any single WCI officer may know about Thompson's altercations with other officers at other prisons was necessarily known by the Individual Defendants in this case. They seek to have the Court assume that Thompson's behavior would be recognized by the Individual Defendants – almost all who were WCI officers untrained in psychology – as rendering him a sufficient risk to others so that he should not be assigned to share a cell with anyone.

Except as to Defendant Heavener, the Amended Complaint does not present factual allegations sufficient to present a Defendants' gross negligence that would waive statutory immunity. Defendant Heavener – because of the plausible claim that he knew of the attack and of Wallace's condition that day –

stands in a different position.  As to him, the Court finds that the Plaintiffs have sufficiently alleged a plausible claim of gross negligence such that his statutory immunity would be waived.

Accordingly, all Defendants, except for Defendant Heavener, are statutorily immune from the claims in Counts III-VI.

### 2.  Public Official Immunity

As to Defendant Heavener, the Court finds that Plaintiffs have plausibly alleged gross negligence.  This would bar him from asserting the affirmative defense of public official immunity.  Cooper, 118 A.3d at 849.

### 3.  Count III: State Constitutional Claims[14]

In Count III, Plaintiffs assert claims under the Maryland Declaration of Rights Articles 24 [15] and 26.[16]  The Declaration of Rights claims are essentially duplicative of the federal

---

[14]    Counts III through VI are state law claims for which Plaintiffs have adequately alleged compliance with the notice provision of the MTCA.  Am. Compl. ¶ 5.

[15]    "[N]o man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges. . . . or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Md. Const. Decl. of Rts. art. XXIV.

[16]    "[A]ll warrants, without oath or affirmation, . . . to seize any person or property, are grievous and oppressive." Md. Const. Decl. of Rts. art. XXVI.

constitutional claims under Counts I and II.[17]  <u>See</u> <u>Okwa v.</u>

<u>Harper</u>, 757 A.2d 118, 140–41 (Md. 2000).  For the reasons stated

above, these claims shall be dismissed against all Individual

Defendants except for Defendant Heavener.


### 4.  Count IV - VI:  Wrongful Death, Survival Action, and Gross Negligence

There are insufficient factual allegations to support a

finding of malice or gross negligence by the Individual

Defendants other than Heavener.  Accordingly, the wrongful death

and survival claims are barred by statutory immunity and are

dismissed against all Individual Defendants except for Defendant

Heavener.

However, the Wrongful Death, Survival Action, and Gross

Negligence claims remaining pending against Defendant Heavener

because they rest on adequate factual allegations against him.

---

[17]     Although Plaintiffs nominally bring claims pursuant to Articles
24 and 26 of the Maryland Declaration of Rights, the substance of
their claims seems to fall under Article 25, the analogue to the
Eighth Amendment.  Article 25 provides "[t]hat excessive bail ought
not to be required, nor excessive fines imposed, nor cruel or unusual
punishment inflicted, by the Courts of Law."  Md. Const. Decl. of Rts.
art. XXV.

IV. <u>CONCLUSION</u>:

For the foregoing reasons:

1. Defendants' Motion to Dismiss Or, In the Alternative, Motion for Summary Judgment **[ECF NO. 94]** is GRANTED.

2. Defendant Reginald Heavener's Motion to Dismiss Plaintiffs' Amended Complaint [ECF No. 93] is DENIED.

3. All claims are dismissed against the following Defendants:  Frank B. Bishop, Jr., George Sneathen, William May, David Stevey, Drew Cook, and three "John Doe" Correctional Officers (Officer #1, The Chief Psychologist; Officer #2, the Chief of Security; and Officer #3, the Housing Unit Manager)

4. All claims remain pending against Defendant Reginald Heavener.

5. Plaintiffs shall arrange a case planning conference to be held with the remaining parties and the Court by May 23, 2018.

SO ORDERED, this <u>Monday, April 23, 2018</u>.


_____/s/_____
Marvin J. Garbis
United States District Judge