# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| VERONICA WALKER, et al., | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. JKB-16-3136 |
| REGINALD HEAVENER, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Jason Wallace was murdered by his cellmate at the Western Correctional Institution ("WCI") on September 13, 2013. This case arises from that tragic incident. Plaintiffs are Wallace's parents, Veronica Walker and Gilbert Wallace, and his surviving minor children, V.W. and K.W. They assert federal and state claims against Correctional Officer Reginald Heavener for conduct relating to Wallace's death. Pending before the Court is Heavener's Motion for Summary Judgment on all counts of the Amended Complaint brought against him. (ECF No. 149.) No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Heavener's Motion will be granted.

## I. *Factual Background*[1]

Jason Wallace was incarcerated at WCI, a Maryland prison, in September 2013. (M.S.J. Ex. 3, ECF No. 149-4.) He shared cell 39 in the B-Tier of Housing Unit 3 with inmate Darnell Thompson. (M.S.J. Ex. 1 at 44:21–46:17, 97:13–100:6, 128:19–129:3, ECF No. 149-2 ("Heavener Dep.").) On September 13, 2013, after Thompson and Wallace had been cellmates for only about

---

[1] The facts are recited here in the light most favorable to the Plaintiffs as the nonmovants on the motion for summary judgment. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

two weeks, Thompson attacked Wallace in their cell sometime between 6:00 p.m. and 6:20 p.m. (Heavener Dep. at 97:13–98:12, 132:1–137:17; Opp'n M.S.J. Ex. 6, ECF No. 152-6; *see also* M.S.J. Ex. 5 at 3, ECF No. 149-6.) Wallace was not provided medical care for the severe injuries he sustained until approximately 7:40 p.m., and he was pronounced dead at 9:00 p.m. (Opp'n M.S.J. Ex. 6 at 2, ECF No. 152-6.)

Defendant Heavener was the correctional officer ("CO") assigned to Wallace's tier on the day of his murder. (Heavener Dep. 94:8–95:6.) His shift began at 8:00 a.m. and ended at midnight. (*Id.* at 100:10–101:20.) As the CO on duty, Heavener was responsible for supervising the inmates on the tier—approximately sixty inmates in September 2013—and ensuring the tier was secure. (*Id.* at 31:17–33:21, 102:8–14.) Heavener was familiar with both Wallace and Thompson and was not aware of any issues between them. (Opp'n M.S.J. Ex. 4 at 33:17–34:19, ECF No. 152-4 ("Heavener Tr. Testimony"); Heavener Dep. at 44:21–48:4.)

On the evening of September 13, 2013, before the attack occurred, Wallace and the other inmates on his tier went to the dining hall for dinner. (Heavener Dep. at 115:7–15.) Wallace sat and talked with a friend, Timothy Middleton, during dinner, and Middleton reported that nothing seemed unusual about Wallace at the time. (Opp'n M.S.J. Ex. 3 at 42:1–21, ECF No. 152-3 ("Middleton Dep.").) The inmates returned to their cells from dinner at approximately 6:00 p.m. (Heavener Dep. at 114:16–117:7; Heavener Tr. Testimony at 14:1–16:21.)

Immediately after the inmates returned from dinner, Middleton heard "lockers banging," "commotion," and "fighting sounds" in Wallace's cell. (Middleton Dep. at 44:16–47:7; Opp'n M.S.J. Ex. 5 at 16:3–17:5, ECF No. 152-5 ("Middleton Tr. Testimony").) Middleton's cell was across the hall and "over one" from the cell that Wallace and Thompson shared, approximately ten or twelve feet away. (Heavener Dep. at 130:1–4; Middleton Dep. at 18:1–11.) Middleton further

2

heard Wallace say "chill, dog" a few times and then heard what sounded like a bunk bed in Wallace's cell "sliding around." (Middleton Tr. Testimony at 5:2–6:22.) After that, the sounds "just stopped." (Middleton Dep. at 46:6–47:7; *see also* Middleton Tr. Testimony at 5:2–6:22.)

Heavener conducted a count of the tier at approximately 6:05 p.m., just minutes after Middleton heard these sounds of "commotion" and "fighting" in Wallace's cell. (Heavener Tr. Testimony at 15:3–16:21; Middleton Dep. at 47:8–49:15.) An officer's count involves looking into each cell on the tier to confirm that every inmate is accounted for and "living, breathing . . . alive." (Heavener Tr. Testimony at 15:6–16:1; *see also* Heavener Dep. at 34:1–35:6.) The cell doors remain closed during counts; the officers look in the cells via windows that are fourteen inches long and somewhere between four and seven inches wide. (Heavener Dep. at 34:2–36:2; Middleton Dep. at 18:19–19:3.) Heavener testified that, during his count that evening, he observed Wallace "on the top bunk [bed]" in his cell and Thompson standing, facing the window. (Heavener Tr. Testimony at 15:3–17:1.) He did not see or hear anything unusual. (*Id.*; *see also* Heavener Dep. at 118:13–119:10.) Middleton saw Heavener look in Wallace's cell and testified that Heavener "didn't have a reaction," so Middleton "thought everything must be cool." (Middleton Dep. at 47:8–49:21.)

Approximately five minutes after Heavener conducted the count, the medical unit called the tier and requested that Thompson be sent to the unit for a urinalysis. (Middleton Dep. at 52:21–53:16; Heavener Tr. Testimony at 17:2–20:11, 44:4–46:21.) Accordingly, Thompson's cell was opened electronically to allow him to walk to the medical unit. (Heavener Tr. Testimony at 18:20–19:20.) Heavener, who was in the "control room" behind the tier, observed Thompson exit the tier and testified that he "appeared to be normal." (*Id.* at 20:6–22:15; *see also* Heavener Dep. at 126:18–127:7.) It was approximately 6:20 p.m. when Thompson left the tier. (M.S.J. Ex. 5 at 3,

3

ECF No. 149-6.) By this time, he had already attacked Wallace. (*See* Heavener Tr. Testimony at 28:7–33:16; Heavener Dep. 135:13–138:10; Middleton Dep. at 53:5–54:10.)

Heavener performed a walk of the tier at approximately 7:00 p.m. (Heavener Dep. at 121:4–21.) The purpose of a walk is to ensure the tier is secure but, unlike a count, it does not entail going down the tier roster and confirming that every inmate on the tier is where they are supposed to be. (*Id.* at 78:18–83:1, 154:14–160:14; *see also* Middleton Dep. at 30:18–41:7.) During his walk that evening, Heavener looked inside each of the cells on the tier and reported that the tier was secure. (Heavener Dep. at 121:4–123:11.)

At approximately 7:30 p.m., the inmates on the tier were allowed out of their cells for recreational time. (*Id.*; Heavener Tr. Testimony at 67:20–68:15.) After the cell doors opened, Middleton observed several inmates "went to look into [Wallace's] cell." (Middleton Tr. Testimony at 7:16–8:5.) Middleton did not think anything of it and proceeded to the recreational area. (Middleton Dep. at 55:14–56:20.) A few minutes later, however, one of those inmates told Middleton that he thought Wallace was dead because "[Wallace] was just laying on the floor in his cell and he had some black stuff coming out of his face." (Middleton Tr. Testimony at 9:1–13.) Immediately after hearing this, Middleton approached Heavener and asked him to check on Wallace. (*Id.*; Middleton Dep. at 57:8–20.)

Seconds after Middleton approached him, Heavener went to Wallace's cell along with CO William May, who was supervising a nearby tier that evening. (Heavener Dep. at 130:19–135:18; *see also* Middleton Dep. at 59:19–60:7.) Heavener "looked in" Wallace's cell through the cell window and "didn't see anything," so he called another CO and asked her to open the cell door electronically from the control room. (Heavener Dep. at 132:2–7.) Once the door to Wallace's cell opened, Heavener saw "blood all over the floor" and Wallace laying on the floor underneath

the bunk bed with his "leg sticking out." (Heavener Tr. Testimony at 28:3–31:20; *see also* Heavener Dep. at 132:2–133:20.) At that time, either Heavener or May instructed another CO to contact the medical unit. (*See* Heavener Dep. at 134:4–6 ("[A]s soon as we seen [Wallace's] foot was up under the bunk, I did ask Officer Riley to call medical at that time."); *but see* Heavener Tr. Testimony at 29:1–6 ("[B]efore we got to pull [Wallace] out I asked Officer May to contact the control center to send up the [ambulance] and to call medical."); *see also* Opp'n M.S.J. Ex. 6 at 7, ECF No. 152-6 (Heavener's statement to police on 09/13/13 that "Officer May notified the control center and instructed Officer Drew Cook to contact the medical department").)

Heavener and May then entered Wallace's cell and pulled him out from under the bunk bed. (Heavener Dep. at 134:1–21.) Wallace was alive but was unresponsive and was having difficulty breathing. (*Id.*; Heavener Tr. Testimony at 61:1–10.) Heavener observed that Wallace had significant facial damage and that there was something "that looked like brain matter" on the floor around him. (Heavener Tr. Testimony at 30:8–31:20; *see also* Heavener Dep. at 135:1–12.) Heavener and May placed Wallace on his side "so he would be able to breathe better." (Heavener Dep. at 134:4–12.) Shortly thereafter, the medical unit arrived and transported Wallace to a nearby hospital. (*Id.*; Opp'n M.S.J. Ex. 6 at 7, 9, ECF No. 152-6.)

Wallace died at approximately 9:00 p.m. that evening from massive head trauma and other injuries he sustained during Thompson's attack. (Opp'n M.S.J. Ex. 6 at 4, 9, ECF No. 152-6.) In May 2016, Thompson was convicted of second degree murder in relation to Wallace's death.

## II. Procedural Background

Plaintiffs filed their original Complaint on September 12, 2016 against the State of Maryland and eleven individual defendants, including Warden Frank Bishop, Jr. of WCI and CO Heavener. (ECF No. 1.) Judge Marvin J. Garbis, who was initially assigned to preside over the

5

case, granted the Defendants' motions to dismiss the Complaint. (ECF No. 81.) He dismissed with prejudice the Plaintiffs' claims against the State of Maryland and their claims for negligence and funeral expenses. (*Id.* at 26.) However, he granted the Plaintiffs leave to file an Amended Complaint consistent with the Court's opinion. (*Id.*)

On October 23, 2017, Plaintiffs filed their Amended Complaint against nine of the individual defendants named in the original Complaint, including Heavener. (Am. Compl., ECF No. 86.) The Amended Complaint asserts claims under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments of the United States Constitution. It also alleges several Maryland constitutional and tort claims. Defendants moved to dismiss the Amended Complaint and, on April 23, 2018, Judge Garbis dismissed all claims except those brought against defendant Heavener. (ECF No. 124.) He reasoned that "Heavener stands in a different position from the other Individual Defendants" because he was present on the tier at the time of Wallace's murder. (*Id.* at 20.)

On August 13, 2018, the case was reassigned to the undersigned. Heavener now moves for summary judgment on all claims against him.

## III. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The moving party bears the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). At the summary judgment stage, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc.*

6

v. *Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then the dispute is material and genuine, and summary judgment should be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

*IV. Analysis*

Plaintiffs assert claims against Heavener for violations of the Eighth and Fourteenth Amendments (Count I), violations of Articles 24 and 25 of the Maryland Declaration of Rights (Count III), wrongful death (Count IV), survival (Count V), and gross negligence (Count VI). (Am. Compl. ¶¶ 73–184.) Heavener moves for summary judgment on all counts. (*See* M.S.J., ECF No. 149.)

*A. Section 1983 Claim*

Plaintiffs bring a claim under 42 U.S.C. § 1983 against Heavener for acting with deliberate indifference to Wallace's health and safety in violation of the Eighth and Fourteenth Amendments.[2] (Am. Compl. ¶¶ 76–80.) To establish a § 1983 claim, a plaintiff must prove that

---

[2] The Court notes that the relevant constitutional provision turns on whether Wallace was a pretrial detainee or a postconviction detainee at the time of the alleged violations. Deliberate indifference claims brought by postconviction detainees arise under the Eighth Amendment, while deliberate indifference claims brought by pretrial detainees arise under the Due Process Clause of the Fourteenth Amendment. *See Hill v. Nicodemus*, 979 F.2d 987, 990–91 (4th Cir. 1992) ("Because [plaintiff] was a pretrial detainee and not a convicted prisoner at the time of the alleged denial of medical care, the standard of care is governed by the due process clause of the fourteenth amendment rather than the eighth amendment's prohibition against cruel and unusual punishment."); *see also Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."). This distinction is merely technical, however, because such claims are subject to the same analysis under either provision. *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 n.11 (4th Cir. 2004) (noting that the standard for evaluating deliberate indifference claims under the Fourteenth Amendment "is the same as that which applies in cases arising under the Eighth Amendment"); *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("In any case, we need not resolve whether Brown was a pretrial detainee or a convicted prisoner because the standard in either case is the same—that is, whether a government official has been 'deliberately indifferent to any [of his] serious medical needs.'") (quoting *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990)); *see also Turner v. Kight*, 121 F. App'x 9, 13 (4th Cir. 2005) ("While a pre-trial detainee's rights with respect to claims of deliberate indifference to serious medical needs are prohibited by the due process clause of the Fourteenth Amendment, rather than the Eighth Amendment, with respect to such claims, a pretrial detainee's due process rights are co-extensive with a convicted prisoner's Eighth Amendment rights."). Accordingly, the Court need not determine whether Wallace was a pretrial or postconviction detainee—and hence which Amendment is the relevant constitutional guarantee—for purposes of resolving the instant motion.

(1) a person acting under color of state law committed the conduct complained of, and (2) the conduct violated rights secured by the laws of the United States or the Constitution. *Temkin v. Frederick Cty. Comm'rs*, 945 F.2d 716, 719 (4th Cir. 1991). It is undisputed that Heavener, a correctional officer for the State of Maryland, acted under color of state law at all relevant times. However, Heavener argues that Plaintiffs' § 1983 claim fails because the record demonstrates that he did not deprive Wallace of any rights and because he is entitled to qualified immunity. (M.S.J. Mem. at 9–20, ECF No. 149-1.) The Court concludes that no reasonable jury could find that Heavener violated Wallace's constitutional rights and, thus, does not address qualified immunity.

A prison official's "deliberate indifference" to the health or safety of an inmate violates the Constitution. *Farmer*, 511 U.S. at 828 (deliberate indifference to the health or safety of postconviction detainees violates the Eighth Amendment); *Hill v. Nicodemus*, 979 F.2d 987, 991–92 (4th Cir. 1992) (same as to pretrial detainees and the Fourteenth Amendment). The test for deliberate indifference includes both an objective and a subjective element. *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). The objective element requires the inmate to "'establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury' or a substantial risk thereof." *Id.* (quoting *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014)); *see also Farmer*, 511 U.S. at 834. The subjective element requires the inmate to show that "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 837). This is a "higher standard for culpability than mere negligence or even civil recklessness." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

The Amended Complaint alleges Heavener acted with deliberate indifference to Wallace's health and safety by: (1) failing to challenge the assignment of Wallace and Thompson to the same

8

cell; (2) failing to stop Thompson's attack; and (3) failing to provide Wallace timely medical care after Thompson's attack. (Am. Compl. ¶¶ 76–80.) However, Judge Garbis dismissed Plaintiffs' deliberate indifference claim to the extent it was based on Wallace's housing assignment. (*See* ECF No. 124 at 16 ("[T]he Amended Complaint presents conclusory allegations that the Inferior Officers (Heavener, May, Stevey, Cook) failed to challenge the housing assignment.").) In addition, Plaintiffs do not oppose summary judgment on their deliberate indifference claim based on Heavener's failure to stop Thompson's attack. (*See* Opp'n M.S.J. Mem. at 6–9, ECF No. 152.) Nor does the evidence show a genuine dispute of fact as to this theory of liability.[3] Thus, as Plaintiffs recognize, their only remaining claim for deliberate indifference is based on Heavener's alleged failure to promptly respond to Wallace's serious medical needs after the attack.

The Court turns to the test for deliberate indifference. The parties do not dispute that the objective element of the test is satisfied. Wallace died as a result of Thompson's attack; he unquestionably had extreme medical needs immediately after the attack. *See Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) ("With regard to inadequate medical attention, the objective component is satisfied by a serious medical condition."); *see also Parker v. Maryland*, 413 F. App'x 634, 640 (4th Cir. 2011) (finding the objective prong satisfied where inmate was fatally attacked by another inmate).

But the parties disagree on the subjective element. Heavener argues that Plaintiffs' deliberate indifference claim fails because the undisputed facts demonstrate that he did not know of Wallace's serious medical needs until Middleton approached him at 7:40 p.m., at which time he immediately responded. (M.S.J. Mem. at 11–18, ECF No. 149-1.) Plaintiffs assert, however,

---

[3] Heavener's undisputed testimony demonstrates that he did not know of any problems between Wallace and Thompson and, further, that he did not observe or hear the attack when it occurred. (*See* Heavener Dep. at 100:1–9; Heavener Tr. Testimony at 15:3–16:21.)

that circumstantial evidence creates a genuine factual dispute as to whether Heavener became aware of Wallace's serious medical needs during his 6:05 p.m. count or 7:00 p.m. walk but deliberately failed to address those needs until 7:40 p.m. (Opp'n M.S.J. Mem. at 6–9, ECF No. 152.)

Plaintiffs rely on the severity of Wallace's injuries and the condition of his cell to support their argument. They point to Heavener's testimony that, when he and CO May went into Wallace's cell at approximately 7:40 p.m., Wallace's leg was "sticking out from under the [bunk] bed," (Heavener Dep. at 132:2–133:20), there was "blood all over the floor," (Heavener Tr. Testimony at 29:12–15), and "stuff that looked like brain matter" was present (*id.* at 30:3–31:20.). Based on this evidence, Plaintiffs say, a reasonable jury could find that Wallace's medical needs were so obvious that Heavener could not have failed to notice them when he looked in Wallace's cell during his 6:05 p.m. count or 7:00 p.m. walk.

It is true, as Plaintiffs point out, that the subjective element of deliberate indifference may be proven by circumstantial evidence. *See Farmer*, 511 U.S. at 842; *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). It is also true, however, that to survive summary judgment on a deliberate indifference claim, there must be sufficient evidence—circumstantial or otherwise—to permit a reasonable jury to conclude that the prison official in fact knew of a substantial risk of harm facing the inmate. *See Farmer*, 511 U.S. at 842–43 ("For example, if ... the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.") (internal quotation marks and citation omitted); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) ("[A]ctual knowledge of the risk of harm to the inmate is required."). Such evidence does not exist here.

Heavener's testimony about Wallace's injuries and the condition of Wallace's cell at 7:40 p.m. demonstrates that Wallace's medical needs were open and obvious at that time from within Wallace's cell. But it does not establish that Wallace's injuries were so open and obvious from the cell window at 6:05 p.m. or 7:00 p.m., when Heavener looked in Wallace's cell during his count and walk, such that Heavener *must* have known of the substantial risk of harm facing Wallace at either of those times. *See Parrish*, 372 F.3d at 303 ("[T]he risk of injury must be 'so obvious that the fact-finder could conclude that the [officer] *did* know of it because he could not have failed to know of it.'") (quoting *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)). Indeed, Heavener testified that, even when he responded to Wallace's cell at 7:40 p.m., he "didn't see anything" when he looked in through the cell window; he only saw Wallace under the bunk bed and "blood all over the floor" once the cell door opened. (Heavener Dep. at 132:2–7; Heavener Tr. Testimony at 27:3–29:19.)

On this record, viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Heavener *should* have known of Wallace's serious medical needs during his 6:05 p.m. count or 7:00 p.m. walk, *i.e.*, because Heavener had a duty to look hard enough to see the state of affairs in that (and every) cell. Deliberate indifference, however, requires more than mere negligence. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."); *Parrish*, 372 F.3d at 303 ("It is not enough that the officers *should have* recognized [the risk]; they actually must have perceived the risk."). It demands that the prison official *actually* knew of a substantial risk to inmate health or safety. *Farmer*, 511 U.S. at 837. Plaintiffs have not adduced evidence from which a reasonable jury could conclude that Heavener had to have harbored such subjective awareness of Wallace's serious

11

medical needs at any time before 7:40 p.m. *Cf. Scinto*, 841 F.3d at 231–32 (finding genuine dispute as to whether official was subjectively aware of inmate's medical needs where official responded to inmate's cell after inmate called for help and inmate testified that his cell "reeked" and there was vomit and blood on his face).

The Court is disturbed by the circumstances that facilitated Wallace's untimely death while in the custody of the state and under Heavener's supervision. There is no deprivation more serious than that suffered by Wallace and the loved ones he leaves behind. But the deliberate indifference standard is "exacting." *Lightsey*, 775 F.3d at 178. It imposes constitutional liability on prison officials only when they subjectively know of and disregard an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837. Although the Court recognizes that this standard leaves inmates without a remedy for many of the devastating harms they endure, it is nonetheless the law. And, on this record, faithful application of the deliberate indifference standard requires the Court to conclude that Heavener is entitled to summary judgment on Plaintiffs' § 1983 claim.

### B.    *Maryland State Law Claims*

Plaintiffs also assert claims against Heavener for violations of Articles 24 and 25 of the Maryland Declaration of Rights (Count III), wrongful death (Count IV), survival (Count V), and gross negligence (Count VI). (Am. Compl. ¶¶ 121–84.) Heavener argues that these claims fail because he is immune from suit under the Maryland Tort Claims Act ("MTCA") and the common law doctrine of public immunity. (M.S.J. Mem. at 21–28, ECF No. 149-1.) He also argues that they are unsupported by the record. Because the Court concludes that Heavener is entitled to statutory immunity, the Court does not address Heavener's alternative arguments for summary judgment on these claims.

### *1. Statutory Immunity*

The MTCA grants state personnel immunity for any "tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence . . . ." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) (West 2019); *see also* Md. Code Ann., State Gov't § 12–105 (West 2019). Correctional officers are considered "state personnel" for purposes of the MTCA. *Cooper v. Rodriguez*, 118 A.3d 829, 857 (Md. 2015). This "broad statutory immunity" extends to acts of negligence as well as intentional and constitutional torts committed without malice or gross negligence. *Lee v. Cline*, 863 A.2d 297, 306, 310 (Md. 2004).

Plaintiffs argue that Heavener is not entitled to immunity under the MTCA because he acted with gross negligence in failing to promptly respond to Wallace's serious medical needs. (Opp'n M.S.J. Mem. at 14, ECF No. 152.) Under Maryland law, gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Cooper*, 118 A.3d at 832–33. In other words, gross negligence occurs when a state employee "is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Bost v. Wexford Health Sources, Inc.*, Civ. No. ELH-15-3278, 2018 WL 3539819, at *44 (D. Md. July 23, 2018).

Gross negligence, like deliberate indifference, is rooted in intentionality. The Court already determined that no reasonable jury could find that Heavener acted with deliberate indifference to Wallace's serious medical needs because the record, at most, supports a finding of negligence. Part IV.A, *supra*. Similarly, the evidence is insufficient to support a finding of gross negligence and, hence, defeat immunity under the MTCA. *See Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001) ("For largely the same reasons that the allegations of the original

13

complaint are insufficient to give rise to an inference of deliberate indifference, they are likewise insufficient to give rise to an inference of gross negligence or malice."). *Cf. Barbre v. Pope*, 935 A.2d 699, 719 (Md. 2007) (holding that plaintiff presented sufficient evidence of gross negligence where defendant, a deputy sheriff, ordered the unarmed plaintiff to raise his hands and, after plaintiff complied, approached the plaintiff with his gun drawn and shot him in the neck). Accordingly, Heavener is entitled to summary judgment on Plaintiffs' claims for violations of the Maryland constitution,[4] wrongful death, and gross negligence.

Moreover, because Plaintiffs have failed to demonstrate any basis for recovery against Heavener, their survival action also fails. *See Carter v. Wallace & Gale Asbestos Settlement Trust*, 96 A.3d 147, 164 (Md. 2014) (stating that a survival action "is in the name of the personal representative for any claim the deceased person could have maintained during his or her lifetime"); Md. Code Ann., Est. & Trusts § 7–401(y)(1) (West 2019).

## V. Conclusion

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

DATED this 10 day of July, 2019.

BY THE COURT:

_____
James K. Bredar
Chief Judge

---

[4] Plaintiffs' Maryland constitutional claims fail for the additional reason that, as the Court determined in Part IV.A, *supra*, no reasonable jury could find that Heavener acted with deliberate indifference to Wallace's serious medical needs. *See Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496 (D. Md. 2013) ("Article 24 of the Maryland Declaration of Rights is the state law equivalent of the Fourteenth Amendment of the United States."); *Arvanis v. Somerset County*, 664 A.2d 888, 894 (Md. 1995) ("... it is well settled in this State that Article 25 of the Maryland Declaration of Rights is in para materia with the Eighth Amendment") (citations omitted); *see also Bost*, 2018 WL 3539819, at *42 ("[T]he analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment."); *id.* (same as to Article 25 and the Eighth Amendment).

14